## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

CHLOE BURNS,

     *Plaintiff,*

  v.

BROWN UNIVERSITY,

     *Defendant.*

C.A. No. 23-CV-00086

Civil Action and
Jury Trial Demanded

### COMPLAINT AND JURY DEMAND

Plaintiff Chloe Burns ("Chloe" or "Plaintiff") brings this action against Defendant Brown University ("Brown" or "the University"), based upon her personal knowledge concerning her own actions and based upon the investigation of counsel regarding all other matters, for the University's failure to comply with the law in connection with its mishandling of and retaliation against her for her complaint of sexual assault and misconduct made to the University and its staff. In support of her Complaint, Chloe states as follows:

### INTRODUCTION

1.     Pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Brown receives federal financial assistance and is required by law to adhere to Title IX's requirements.

2.     Chloe is the survivor of sex/gender-based discrimination, sexual assault, and sexual harassment while attending Brown. Chloe's rapist was another Brown student. Despite having a

known duty to protect its female students from harm and respond appropriately and in accordance with the law when a female student is harmed, Brown not only failed to carry out its duty to protect Chloe but actively retaliated against her for registering her Title IX Complaint and for complaining about Brown's handling of the same.

3.     Brown's mishandling of Chloe's Title IX Complaint and its retaliation against her are rendered all the more atrocious given that Brown knew it had, and still has, a systemic problem of improperly handling sexual harassment and sexual abuse allegations, contrary to its federal mandates under Title IX, and failed to rectify that problem prior to Chloe's assault, instead setting up a system that dissuades and actively thwarts reporting of sexual assault and misconduct despite its knowledge of a pervasive and ongoing problem.

4.     Chloe's Title IX Complaint to the University's Title IX Office was rendered futile by Brown, as were the complaints of countless other female students, because Brown employees, who were mandatory reporters under Title IX, discouraged or even overtly prevented the proper investigation of Chloe's sexual assault and abuse allegations and failed to provide Chloe with resources and support as required by law.

5.     As a result, Chloe's Title IX Complaint was inadequately investigated and addressed, which effectively ratified the assault her perpetrator had committed against her.  By retaliating against Chloe, Brown continued perpetuating its culture of silence and a hostile educational environment with respect to such claims.

6.     Brown's investigation of and response to Chloe's Title IX Complaint is insufficient and does not comply with (a) federal law, including Title IX response requirements as outlined in guidance issued by the U.S. Department of Education Office for Civil Rights ("OCR"); (b) Rhode Island state law; and (c) Brown's own internal policies and procedures discussed herein.

7.     Brown also failed to follow its own policies and procedures in responding to and investigating Chloe's Title IX Complaint and did not provide appropriate training to its staff and faculty on how to handle and address complaints subject to Title IX protection.

8.     Moreover, Brown's Title IX policies are contradictory, confusing, and difficult to understand both for students and employees.

9.     Brown's failure to appropriately respond to and investigate Chloe's Title IX Complaint, as well as the sex/gender discrimination and Title IX retaliation and other harms perpetrated by Brown against Chloe, caused Chloe severe harm, violated the law, and denied Chloe the ability to participate fully in her education as a Brown student.

10.     As a result of Brown's pattern and practice of misconduct, including its pattern and practice of engaging in retaliation against Chloe, Chloe has been excluded from participation in, has been denied the benefits of, and has been subjected to discrimination by Brown.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*

12.     This Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331, which grants the district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to

recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

13.     Chloe's claims are cognizable under the United States Constitution, 42 U.S.C. § 1681 *et seq*. and under Title IX.

14.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     The events giving rise to this lawsuit occurred in the city of Providence, Rhode Island, which sits in this District.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

16.     Brown is subject to the Court's personal jurisdiction with respect to this action.

## THE PARTIES

17.     Chloe is a person of the age of majority and a former student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Chloe is a citizen of the State of Colorado.

18.     Defendant Brown was at all relevant times and continues to be an educational institution in Providence, Rhode Island, organized and existing under the laws of the State of Rhode Island, with an address at 1 Prospect Street, Providence, RI 02912.

## INTRODUCTION TO CHLOE'S CLAIMS

19.     Chloe graduated from Brown in 2019 with a degree in Cognitive Neuroscience, but her journey to completion of that degree was rife with trauma and severe distress from Brown's pattern and practice of retaliatory conduct against her.  She is the survivor of an April 14, 2016 sexual assault by a male Brown student, which occurred at her on-campus sorority house while she was incapacitated.

20.      As detailed herein, after Chloe filed her formal Title IX Complaint with Brown's Title IX Office, Brown engaged in a series of actions designed to favor Chloe's assailant, a well-liked "star" male student at Brown, and retaliate against Chloe for the same, including, but not limited to, allowing the assailant's private investigator to harass witnesses testifying on Chloe's behalf for several weeks, failing to investigate Chloe's retaliation complaint against her assailant, and selecting her assailant as a graduation speaker after finding him responsible for committing Chloe's assault, all of which culminated in Brown it rendering a finding on August 6, 2018 that Chloe was responsible for retaliating against her assailant in violation of Brown's Sexual and Gender-based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy.

## BROWN'S TITLE IX PROGRAM AND
## ITS NOTICE OF DEFICIENCIES IN SAID PROGRAM

21.      At all times relevant to this Complaint, Brown had two policies which guided the University's response to potential Title IX violations: (1) the Title IX Policy, which Brown titled the "Sexual and Gender-Based Harassment, Sexual Assault, Interpersonal Violence, and Stalking Policy",[1] last approved February 23, 2021 with an effective date of March 19, 2021; and (2) the Sexual and Gender-based Misconduct Policy, last approved February 16, 2021.[2]

22.      The Title IX Policy includes the following statement of purpose:

This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy. It also defines Prohibited Intimate Relationships between individuals where

---

[1]   https://www.brown.edu/about/administration/title-ix/Sexual%20and%20Gender-Based%20Harassment%2C%20Sexual%20Assault%2C%20Interpersonal%20Violence%2C%20and%20Stalking%20Policy (last visited February 14, 2023).

[2]   https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy (last visited February 14, 2023).

one individual has power or authority over another which could create a hostile environment.

This policy is in accordance with Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

23.    The Title IX Policy further reads: "Taking meaningful action when conduct prohibited by this policy occurs is a critical component to Brown's commitment to a campus that is free from discrimination and harassment.  Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist us in these efforts by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer.  Such reports amplify the University's ability to know what is occurring within its programs and activities and to respond accordingly.  The Title IX Program Officer will conduct an initial assessment of these reports and will do so in a manner consistent with the privacy choices of the Complainant or reporting party."

24.    The Sexual and Gender-based Misconduct Policy includes the following statement of purpose:

This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Sexual Exploitation and Provision of Alcohol and/or Other Drugs for Purposes of Prohibited Conduct.  This policy also prohibits Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy.

This policy is in accordance with relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

25.    The Sexual and Gender-based Misconduct Policy addresses prohibited conduct, including sexual assault, that occurs off-campus and is a complement to the Title IX Policy.

26.     Pursuant to Section 3.1.4 of Brown's Sexual and Gender-based Misconduct Policy regarding Mandatory Reporters, "Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist … by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer."[3]

27.     Pursuant to Section 3.1.5 of Brown's Sexual and Gender-based Misconduct Policy, "[t]he University will accept a report of Prohibited Conduct at any time" and "[t]here is no time limit on submitting a Formal Complaint."  Additionally, "the University will provide reasonably available and appropriate support measures, assist the Complainant in identifying external reporting options, and may take appropriate action to address the Prohibited Conduct," even if the "the Complainant and/or Respondent is no longer affiliated with Brown."[4]

28.     Pursuant to Section 6.0 of Brown's Sexual and Gender-based Misconduct Policy, the "[f]ailure to comply with this and related policies is subject to disciplinary action, up to and including suspension without pay, or termination of employment or association with the University, in accordance with applicable (e.g., staff, faculty, student) disciplinary procedures."[5]

29.     Furthermore, Section 4.0 of Brown's Sexual and Gender-based Misconduct Policy defines retaliation as "any action, statement, or behavior meant as reprisal or retribution against an individual in response to the individual's good-faith report or participation in a proceeding related to this policy.  Any retaliatory action taken directly or indirectly against a person who has made a report, filed a complaint, or participated in an investigation is prohibited."[6]

---

[3]  *Id.*

[4]  *Id.*

[5]  *Id.*

[6]  *Id.*

30.    Both the Title IX Policy and Sexual and Gender-based Misconduct Policy incorporate by reference Brown's Title IX Grievance Procedure, effective February 16, 2021, for responding to Formal Complaints, which are "request[s] for an investigation and initiation of [the] complaint procedure."[7]  "Only a Complainant or the Title IX Program Officer can submit a Formal Complaint."[8]

31.    "Upon receipt of a Formal Complaint, the Title IX Program Officer will make the following determinations to decide upon the applicability of policies:

- Could the facts set forth by the Formal Complaint, if substantiated, constitute conduct prohibited by the Policy?

- Was the Complainant a Covered Persons as defined in the Policy when the alleged Prohibited Conduct occurred?

- Is the Respondent currently enrolled or employed?

- Did Brown University exercise substantial control over both the Complainant and Respondent at the time in which the alleged Prohibited Conduct occurred?

If the answer to each question is "YES" then the Policy and this procedure applies, and the Title IX Office has the authority to investigate and resolve the Formal Complaint."

*Id.*

32.    Alternatively, the Title IX Grievance Procedure provides for an informal resolution process that "involves a facilitated resolution that is acceptable to the Complainant and Respondent." *Id*. Under the informal resolution process, "a full investigation of the allegation is not conducted" and the matter is considered closed once resolved through an informal resolution

---

[7]    https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy/sexual-and-gender-based-misconduct-complaint-proc, (last visited February 14, 2023).

[8]    *Id.*

process. "In all cases, the Title IX Program Officer [has] the discretion to determine whether an informal resolution or mediation is appropriate to the circumstances."[9]

33.    The Corporation for Brown University, the University's governing body, also has a policy on Equal Opportunity, Nondiscrimination and Affirmative Action ("Equal Opportunity Policy"),[10] last revised on October 15, 2022, which reads, in relevant part: "Brown University provides equal opportunity and prohibits discrimination, harassment and retaliation based upon a person's race, color, religion, sex, age, national or ethnic origin, disability, veteran status, sexual orientation, gender identity, gender expression, or any other characteristic protected under applicable law and caste which is protected under this policy, in the administration of its policies, programs, and activities."

34.    Moreover, among other things, Title IX requires colleges and universities to: (i) respond promptly to every reported instance of sexual assault, harassment, or violence; (ii) offer supportive measures to survivors, regardless of whether the survivor chooses to file a formal complaint; (iii) refrain from pressuring a survivor into not filing a formal complaint or participating in a grievance process; (iv) protect survivors from having to come face-to-face with their accused in the Title IX process; and (v) not retaliate against a survivor for reporting sexual misconduct, choosing to file a formal complaint, or choosing to participate in a grievance process.

35.    Brown repeatedly engaged in discriminatory, retaliatory, and other unlawful conduct in its interactions with Chloe in response to Chloe's report of sexual assault and other sexual misconduct, in violation of Title IX, Brown's own Title IX Policy, Brown's Sexual and

---

[9]    *Id.*

[10]    https://www.brown.edu/about/administration/corporation/corporation-policy-statement-equal-opportunity-nondiscrimination-and-affirmative-action (last visited February 14, 2023).

Gender-based Misconduct Policy, and the Corporation for Brown University's Equal Opportunity Policy.

36.    Upon information and belief, the training Brown provided to its students and employees regarding its sexual misconduct and anti-discrimination policies, definitions, and investigation and reporting procedures falls far short of the OCR's standards in terms of educating community members at higher education institutions about their rights and obligations with respect to sexual misconduct and sex/gender discrimination on campus.

37.    As part of its Common Data Set initiative, Brown reported 10,257 undergraduate and postgraduate students in Fall 2018; 10,333 undergraduate and postgraduate students in Fall 2019; and 9,948 undergraduate and postgraduate students in Fall 2020.[11]

38.    Upon information and belief, institutions of the same size and scale as Brown generally provide more comprehensive training to students and employees to inform them of their rights and obligations under the institution's Title IX policies than Brown does.

39.    Upon information and belief, at all times relevant to this Complaint, the Title IX Office at Brown did not have a dedicated Title IX investigator to ensure that an institution with approximately 10,000 students and numerous other employees remained free of sex/gender-based discrimination.

40.    Upon information and belief, at all times relevant to this Complaint, the Title IX Office at Brown relied on only two investigators supplied by the Office of Institutional Equity and Diversity (OIED), consisting of an Institutional Equity Officer and an Institutional Equity

---

[11]  As set forth on Brown's website, the Common Data Set is a standardized set of questions most often asked by parents, students, and other members of the higher education community. https://oir.brown.edu/institutional-data/common-data-set (last visited February 14, 2023).

Investigator, both of whom have responsibilities within OIED unrelated to Title IX, and which OIED responsibilities were in addition to their responsibilities as Title IX investigators.

41.    Brown's Title IX Office was woefully inadequate and insufficiently staffed to meet the needs of its campus and fell well outside the scope of standards required for an institution of Brown's size.

42.    Additionally, upon information and belief, to curb reporting of the increasing number of sexual misconduct incidents at Brown, Brown causes Title IX complaints to be purposefully buried or diverted, which means that complaints are never properly investigated or addressed, and offending students are not negatively impacted.  The concealment of Title IX complaints benefits Brown both financially and reputationally, while causing further harm to Chloe.

43.    The Title IX Office publishes an Annual Outcome Report on complaints of sexual misconduct brought to the attention of Brown officials and the outcomes of those complaints. According to those Annual Outcome Reports:

- 59 incidents were reported to the Title IX Office between July 2016 and June 2017, but only 12 formal complaints were filed and only 4 findings of responsibility at the time of publication;[12]

- 92 incidents were reported to the Title IX Office between July 2017 and June 2018, but only 9 formal complaints were filed and only 3 findings of responsibility;[13]

---

[12] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/AnnualOutcomeReportsOctober2017_final%20%281%29.pdf (last visited February 14, 2023).

[13] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/106390_OIED_Title%20IX%20Annual%20Outcomes%20Report_0419%20FNL_0.pdf (last visited February 14, 2023).

- 99 incidents were reported to the Title IX Office between July 2018 and June 2019, but only 11 formal complaints were filed and only 4 findings of responsibility;[14] and

- 103 incidents were reported to the Title IX Office between July 2019 and June 2020 but only 9 formal complaints were filed and only 5 findings of responsibility.[15]

44.    Brown's Title IX Office also regularly fails to provide survivors of sex/gender-based discrimination and/or harassment who report sexual abuse or misconduct with supportive measures, as required by Title IX and Brown's own policies.

45.    Brown's insufficient response to Chloe's reports of Title IX violations subjected Chloe to further harassment and created a sexually hostile and toxic environment on campus.

46.    Chloe suffered harm as a direct and indirect result of Brown's common pattern of actions and inactions, as detailed herein.

## CHLOE'S SPECIFIC FACTUAL ALLEGATIONS

47.    The details of Chloe's experience with Brown and Brown's continuing course of retaliation began on April 14, 2016 when she was sexually assaulted.  During the assault, Chloe was intoxicated to the point of being nearly unconscious, rendering her unable to consent to any sexual activity.  Although she was mostly unconscious for the duration of the assault, she awoke for a moment to discover her assaulter naked and on top of her before passing out again.  Chloe later woke up to bruises on her arms, lip, and inner thighs, and she discovered blood on her bra.

---

[14]  https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/Title%20IX%20Annual%20Outcomes%20Report_2018-2019.pdf    (last   visited February 14, 2023).

[15]  https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/TIXAnnualReport20192020_FNL.pdf (last visited February 14, 2023).

48.     Following the assault, Chloe's abuser repeatedly attempted to initiate contact with her, forcing Chloe to obtain a No Contact Order in December 2016 through the Office of Student Conduct and Community Standards.

49.     Despite the No Contact Order, Chloe's assaulter continued to engage in a pattern of harassment and intimidation, including visiting Chloe's dorm, attempting to get her attention at a concert, and initiating contact with Chloe's friends to get her attention.

50.     In May 2017, Chloe filed a Formal Complaint with the Title IX Office against her assaulter.

51.     From the time she first filed her Formal Complaint and in direct response thereto, Brown began engaging in a series of retaliatory actions designed to dissuade Chloe from continuing the Title IX process and ultimately punishing her for the same.

52.     Upon information and belief, Chloe's assailant was a top student at Brown who was heavily involved in various Brown student organizations.  Brown thus engaged in its course of retaliatory conduct against Chloe in a misguided effort to protect its own reputation and that of this particular student.

53.      First, immediately after Chloe filed her Formal Complaint, Brown allowed her assaulter to file a cross-complaint against Chloe alleging that it was Chloe who had, in fact, sexually assaulted him on April 14, 2016.  The temporal proximity between Chloe's filing of her Formal Complaint and her assailant's filing of his cross-complaint evinces that her assailant's cross-complaint was merely further retaliation against her for her own filing of a Formal Complaint.

54.     After allowing her assailant to file a cross-complaint against Chloe for the same sexual activity, Brown then showed objective favoritism to her assailant by permitting her assailant

to continue his course of retaliation. Specifically, in May 2017, Chloe notified Brown's Title IX Office that her assailant was engaging in retaliatory conduct when she learned that her friends and witnesses involved in her Title IX Complaint were being harassed by a private investigator retained by her assailant. Despite Chloe's claims that she and other participants in the Title IX process were being intimidated and harassed by her assailant as a result of her initiation of and their participation in her Title IX complaint, in violation of its Sexual and Gender-based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the very same policy that Brown would later use to discipline Chloe), Brown did nothing to stop the harassment for several weeks.

55.     Additionally, although Brown assured Chloe that her complaints of retaliation against her assaulter would be considered in the determination of her own Formal Complaint, negating the need for Chloe to file a separate retaliation complaint against her assaulter, the Title IX Office in fact failed to include any of her allegations of retaliation in the Investigator's Report. This omission was critical – the Investigator's Report is a key component of Brown's ultimate determination regarding liability for the allegations made in Chloe's Formal Complaint. Without any discussion of Chloe's retaliation allegations against her assaulter in the Investigator's Report, those allegations were in reality omitted and not considered by Brown. This was especially so as Chloe was directed by Brown to not file an independent retaliation complaint against her assaulter. This was also despite the fact that Chloe's assaulter's retaliatory conduct against Chloe was egregious and resulted in at least one of Chloe's witnesses refusing to speak with the Title IX Investigator assigned to Chloe's Formal Complaint, impacting Brown's ultimate review and determination of liability related to that Formal Complaint.

14

56.    A hearing on both Chloe's Formal Complaint and her assaulter's cross-complaint took place on or about October 30, 2017.  Chloe's assaulter was found responsible for non-consensual sexual touching, and therefore was sanctioned with an 18-month suspension from Brown and mandated to complete consent counseling.  Chloe was found not responsible for the cross-complaint filed by her assaulter.

57.    Chloe's assaulter appealed his finding of responsibility and related sanctions and the Title IX panel's finding that Chloe was *not* responsible for sexually assaulting him.  Despite the Title IX panel's previous finding that her assailant was responsible for Chloe's sexual assault—and the clear danger he posed to Chloe pursuant to that finding—Brown permitted him to remain on campus, imposed no official restrictions on his access to campus facilities, and allowed him to attend classes during the pendency of his appeal.

58.    Throughout this period, Brown did not provide Chloe with any protection or assurances for her safety on Brown's campus.  In fact, Brown's Title IX Office did not even notify Chloe that her assaulter had returned to campus, despite its policy to notify survivors of their assailant's physical presence on campus.

59.    While his appeal was pending, on or about November 8, 2017, Chloe's assaulter was selected to be a mid-year graduation speaker for Brown, a notable honor by the University only given to two students from the entire graduating class.

60.    Brown did not inform Chloe that her assailant had been honored with selection as a mid-year graduation speaker despite that at the time that this honor was bestowed upon her assaulter, Brown had found him responsible for the sexual assault of Chloe.  Chloe instead learned about her assailant's selection for this honor in her assailant's appeal letter to Brown's Title IX Office.

61.    Upon learning of his selection by Brown, Chloe met with Brown's Title IX Program Officer to discuss her concerns.  Several of Chloe's close friends were graduating from Brown and she had looked forward to attending graduation and celebrating her friends' accomplishments. Brown's Title IX Program Officer told Chloe that the Title IX Office "did not have any authority" to make changes to the selection of graduation speaker, despite the fact that it was the Title IX Office's Formal Complaint process that resulted in a finding against Chloe's assailant that he was liable of sexual assault and further had the authority to sanction him.  Specifically, the Title IX Program Officer told Chloe that "she can't take things away from [the assailant] that you can never take back."  As detailed below, Chloe would also later learn that Brown's Title IX Office further failed to inform relevant Brown employees of the liability finding against her assailant.

62.    After trying and failing to get the Title IX Office to act reasonably, Chloe contacted an Associate Dean at Brown who oversaw and was in charge of the mid-year graduation ceremony. The Associate Dean was shocked to learn of Chloe's history with her abuser and the Title IX responsibility finding against him, which she was not aware of previously.

63.    The Associate Dean had not been made aware of this information at the time Brown selected Chloe's assaulter as the graduation speaker and had not been advised of the responsibility finding against him, contrary to the Title IX Grievance Procedure requiring that appropriate campus officials be notified of the outcome and determination of Formal Complaints where there is a finding of responsibility.  The Associate Dean further told Chloe that she could not believe that Brown did not have policies or procedures in place to prevent this from happening (*i.e.*, Brown's decision to honor a student who had an adverse finding against him for sexual assault of another student).  The Associate Dean was shocked by Brown's decision to select Chloe's assailant for this honor.

64.     Similarly, Chloe's friend also raised concerns to Brown's Associate Dean regarding the impact of Brown's decision to honor Chloe's assailant would have on all survivors of sexual assault.

65.     On or about November 30, 2017, Chloe received correspondence directly from the Dean of the College at Brown, someone with whom she had never before spoken, stating that the University would not change its mind regarding the decision to have Chloe's abuser, a student who had been found responsible for non-consensual sexual touching and sanctioned with, among other things, suspension from the University following a Formal Complaint with the Title IX Office, as its mid-year graduation speaker.

66.     The November 30, 2017 correspondence was Chloe's first and only interaction with the Dean of the College and came as a surprise to Chloe, as she was not previously informed that specific details from her Title IX Complaint process where being shared with other Brown employees without Chloe's prior notification or consent.

67.     The same day, the Deputy Dean requested a meeting with Chloe's assailant, where the Deputy Dean informed Chloe's assailant of Chloe's "frustration" with Brown's decision to award him the speakership despite the responsibility finding.  Chloe's assailant also met with Brown's Title IX Program Officer who confirmed Chloe's "frustration," but assured Chloe's assailant that Brown had "refused" Chloe's request that he be prohibited from speaking at mid-year graduation.

68.     Not only did Brown repeatedly tell Chloe that nothing could be done about her assailant's selection as a graduation speaker, an academic honor awarded to an individual found liable of sexual assault and facing potential suspension, Brown did not even notify Chloe of the decision to award her assailant this honor and further failed, at a minimum, to notify Chloe that

her assailant would be physically present on campus for this event, for which Brown's Title IX Program Officer apologized to Chloe and noted was contrary to the Title IX Office's "usual practice." Brown's decision to honor Chloe's assailant meant that Chloe, who had been looking forward to attending the ceremony, would be unable to attend for fear of seeing or interacting with her assailant.

69.    Moreover, an Assistant Dean at Brown confirmed that a requirement for selection as graduation speaker was to certify that any speaker candidate would in fact graduate. Therefore, in selecting Chloe's assailant as a graduation speaker, Brown went further out of its way to not follow and/or make an exception to its own policy for the benefit of Chloe's assailant and at the expense of Chloe. This is evidenced by the fact that, although his sanctions were held in abeyance during the pendency of Chloe's assailant's appeal of his finding of liability for sexual assault, that appeal does not negate the fact that at the time Brown selected Chloe's assailant as a graduation speaker it knew that there was a significant risk that her assailant would not in fact graduate. Moreover, Brown's Associate Dean only became aware of the adverse finding through Chloe and not from Brown's Title IX Office, even though the Title IX Office was in fact responsible for informing the Associate Dean of the adverse finding. Brown's decision to allow Chloe's assailant to continue as a graduation speaker was therefore an intentional decision by Brown to further traumatize and harm Chloe and undermine the University's Title IX Formal Complaint process and the validity given to conclusions reached by that process, which further served to create an unsafe and hostile campus environment for both Chloe and other female students at Brown.

70.    After Brown and its Title IX Office refused to protect Chloe after her assault, instead choosing to honor and promote her assailant, Chloe contacted various news publications, including a newspaper publication called The Tab, which focuses on university and higher

education-related issues. Chloe approached The Tab and other news publications in an effort to publicize Brown's Title IX institutional deficiencies. Chloe's objective was to find media organizations willing to highlight Brown's Title IX failures, evidenced by the fact that Brown was ignoring a survivor's request that her assaulter, who had been found liable of sexual assault by Brown, not be given the privilege of speaking at Brown's graduation ceremony.

71.    Chloe's purpose in approaching these media outlets was to inform the public of Brown's institutional failures to support and protect survivors of sexual assault. She sought to highlight Brown's institutional deficiencies in protecting its image at the expense of supporting survivors. Chloe's intent in approaching The Tab and other newspapers was to spur publication of an article that highlighted how Brown knew of the facts of her assault and chose to honor the perpetrator instead of protecting the victim. Chloe's intent to highlight Brown's systemic failures related to sexual assault survivors was included in the Investigator's Report related to her Formal Complaint and her assailants cross-complaint with Brown's Title IX Office.

72.    Ultimately, The Tab decided to publish an article regarding the events described herein. Chloe had no control over the publication by the newspaper, which was originally printed on December 1, 2017, and later updated due to, upon information and belief, Brown's intervention and discussions with The Tab about the article on the assailant's behalf in January 2018.[16]

73.    In response to Chloe's involvement with The Tab article and her effort to publicize the systemic failures of Brown's Title IX process, Brown continued its campaign of retaliation against Chloe, going to great lengths to assist and protect her assailant and the University's own reputation, as it had been doing since she first filed her Formal Complaint.

---

[16] https://thetab.com/us/brown/2017/12/01/assault-brown-title-ix-4306 (last accessed February 14, 2023).

74.    Initially, after publication of the article in The Tab, Chloe's Title IX advisor, a Brown Associate Dean of the College who had up until that point been a strong ally for Chloe throughout her Title IX process, informed Chloe that she could no longer act as her official Title IX advisor.  Chloe believed that her advisor's withdrawal in this manner was prompted by Brown in response to The Tab article.

75.    Moreover, in stark contrast to the non-existent protection, assistance, or concern Brown showed Chloe, especially when she raised repeated concern about her assailants retaliation and witness intimidation and then later about her assailant's selection for the honor of speaking at graduation, Brown, upon notification by the assailant of The Tab's impending news article and his inquiry as to "what could be done" to make the story "not happen," quickly congregated a meeting with Chloe's assailant, his attorney, and Brown's Dean, Brown's Vice President for Communications, and Brown's Director of News and Editorial Development.  As detailed in the Investigative Report related to Chloe's assailant's retaliation complaint, together these high-level Brown administrative employees urgently met with Chloe's assailant and his attorney for an "intense" hour and a half discussion concerning how they collectively could "prevent the story" from publication.[17]  Also in stark contrast to Brown's treatment of Chloe after she filed her Formal Complaint, these high-level Brown administrative employees also helped her assailant determine the "pros and cons" of moving forward as graduation speaker in light of the news publication and the implications of "how things could play out."  Moreover, after publication of the initial news article, Brown reached out to The Tab and, upon information and belief as a result of those

---

[17] By way of further contrast, and as noted *supra*, Chloe had never interacted with the University Dean in person or otherwise until receipt of an e-mail from same notifying Chloe that no action would be taken to prevent her assailant from obtaining the distinct honor of speaking at his graduation ceremony.

discussions, the original article was altered and pictures of Chloe's assailant, that were previously included in the article, were removed.

76.     On December 1, 2017, Chloe received a litigation notice from an attorney representing her assaulter regarding publication of the article by The Tab.  Upon information and belief, Brown also received a litigation notice from the same counsel.

77.     After receipt of the litigation notice, Brown and its Title IX Office continued to engage in conduct intended to retaliate against Chloe in response to her decision to file the Formal Complaint and participate in The Tab's investigation into Brown and its publication of its article about Brown, which article Chloe prompted expressly to highlight and inform the community about Brown's systemic failures in supporting and protecting survivors of sexual assault.

78.     In contrast to Brown's immediate and high-level support and guidance to Chloe's assailant, Brown failed to inform Chloe that her assailant ultimately decided to withdraw as graduation speaker, which Chloe instead learned from a University update notifying the entire student body that there would only be a single graduation speaker.

79.     After publication of the news article, Brown's Title IX Office never asked Chloe about her mental health or what prompted her to reach out to the news outlet.

80.     The Title IX Office also failed to provide Chloe with any resources or support measures, leaving Chloe no choice but to go outside the University for guidance and support. Chloe therefore retained SurvJustice, a legal organization that provides services to survivors of sexual violence, and paid out-of-pocket for representation.  However, Brown repeatedly and routinely failed to copy Chloe's legal advisor on communications related to this matter despite Chloe's many requests that her counsel be included, just as her assailant's counselor was apparently being included on his communications with the Title IX Office.

21

81.     On December 4, 2017, the Title IX Office permitted Chloe's assaulter to file a retaliation claim against her for speaking publicly about her experience, which she had only done to highlight the favoritism and retaliation she was experiencing from Brown in response to her initial Title IX Complaint.

82.     To further that retaliation, evinced by Brown's continued favoritism towards her assailant, on December 19, 2017, a three-person committee from the Title IX Council granted the appeal filed by Chloe's assaulter, without a hearing, and overturned the finding of responsibility against him for non-consensual sexual touching.

83.     After receipt of her assailant's retaliation claim, Choe approached the Title IX Office about filing a retaliation claim against her assailant, explaining that her assailant's act of filing the retaliation claim against her was in and of itself an act of retaliation against Chloe for her original Title IX Formal Complaint.  Unlike Brown's response to her assailant's retaliation complaint or its allowance of her assailant to file the original cross-complaint against Chloe after she filed her Title IX Formal Complaint, Brown did not respond to Chloe's retaliation concerns for several weeks.  After Chloe followed-up on the status of her request on multiple occasions, Brown finally responded.  But Brown then did not allow Chloe to file her own retaliation complaint against her assailant, informing her that she could not bring a new Complaint against a student who had already graduated.  Chloe was shocked by this information, as her assailant was allowed to bring a retaliation claim against her without the same restriction.  Chloe was also deeply frustrated because this was the second time that she had informed Brown's Title IX Office that she wanted to pursue her own retaliation claim against her assailant, which Brown first said that it would consider, but never did, and then prevented her from filing.

84.    Additionally, even in instances where the Title IX Respondent has already graduated, Brown is required to "provide reasonably available remedial measures as appropriate," "assist [Chloe] in identifying external reporting options," and "take appropriate action" to address the assailant's retaliatory conduct.[18]

85.    Instead of adhering to its own policy, Brown prevented Chloe from filing the formal retaliation complaint on two separate occasions, including when her abuser was still a Brown student, and took no action to address her abuser's conduct.  Brown's treatment of Chloe is in stark contrast to its treatment of her assailant.

86.    In April 2018, due to concerns for her safety arising from her assaulter's escalating steps to retaliate against her through a purported defamation claim, as well as her general fear of him arising from the initial sexual assault, Chloe sought to supplement her December 2016 No Contact Order by obtaining a No Trespass Order from the Brown Department of Public Safety. Brown denied that request summarily.  Due to her assailant's escalating retaliation and Brown's acquiescence to the same, Chloe no longer felt safe and comfortable walking through campus alone.  Instead, she made sure to have an escort with her at all times.

87.    Additionally, despite Brown's and its Title IX Office's clear favoritism towards her assailant, Chloe continued to defend against the retaliation claim and sought to have it dismissed. Chloe repeatedly asked the Title IX Office if dismissal was possible given the totality of the facts, starting with her original request for dismissal on February 8, 2018.

88.    After repeated attempts to follow up, on June 15, 2018, Chloe once again followed up with Brown's Title IX Office regarding her request for dismissal of her assailant's retaliation

---

[18] https://www.brown.edu/about/administration/title-ix/Title%20IX%20grievance%20Procedure (last accessed February 14, 2023).

complaint after receiving Brown's notice of hearing related to that complaint.  Brown sent that notice of hearing despite failing to render a decision on, and apparently completely ignoring, Chloe's request for summary disposition, which request she had repeatedly raised with Brown and which determination had the possibility of negating the need for a hearing.  In that same communication, Chloe also repeated the need to ensure her SurvJustice legal advisor was copied on all communications related to this matter, as Brown had repeatedly failed to copy her counsel on relevant communications despite Chloe's repeated requests to Brown's Title IX Office to do so.[19]

89.    Also on or about June 15, 2018, and only after receipt of Chloe's e-mail which repeated her request for summary disposition, upon information and belief, Brown's Title IX Office finally submitted Chloe's request for summary disposition to the Chair of the Title IX Council.  This is despite the fact that Choe had originally submitted her summary disposition request to Brown on February 8, *over four months prior*.

90.    On June 22, 2018, Chloe received notice from the Title IX Office that the Chair of the Title IX Counsel had rejected Chloe's request for summary disposition.

91.    A hearing on Chloe's assailant's retaliation claim against Chloe took place on July 23, 2018.

92.    On August 3, 2018, Chloe received an email from Rene Davis ("Davis"), Brown's interim Title IX Program Officer, stating that, after the Title IX Committee decided the retaliation claim, the University itself would review the panel's decision.

---

[19] Chloe also had to repeatedly request that the Title IX Office use her personal email account for communications related to the Title IX proceedings, another request that was repeatedly ignored by Brown's Title IX Office.

93.    Chloe was struck by this correspondence from Davis, in light of the correspondence Chloe had received directly from the Dean of the College, because this secondary level review by the University was not a standard practice or process specified in Brown's Title IX Grievance Procedure.

94.    Upon information and belief, Brown added a second level review to the Title IX Committee's determination of Chloe's assailant's retaliation claim, although not part of the typical policy or protocol, because of Chloe's article in The Tab newspaper.

95.    On August 6, 2018, the Title IX Committee found Chloe responsible for retaliation, and she received a written reprimand.  Chloe learned of the finding that same day.

96.    On August 9, 2018, Chloe requested an extension from the Title IX Office, until August 15, 2018, to appeal the finding of responsibility for retaliation.  The request was granted.

97.    However, due to her trauma, Chloe felt helpless in pursuing an appeal.  Chloe also did not appeal the finding of responsibility for retaliation due to her ongoing fear that Brown would continue to retaliate against her due to her filing of the Formal Complaint and her public vocalization of issues with Brown's Title IX process, including the article in The Tab.  Given the totality of the circumstances and the ongoing pattern of retaliation by Brown, Chloe also strongly believed that if she chose to appeal the retaliation liability finding, which originally carried a sanction of a written reprimand, that there was a strong likelihood that Brown would impose a harsher sanction as a result of the appeal process, in further retaliation against Chloe.  Therefore, due to Brown's retaliatory conduct up until this point, Chloe ultimately decided to not appeal the retaliation finding against her.

98.    On August 15, 2018, Chloe received correspondence from the Title IX Office stating that her matter was closed in that office because she had not filed an appeal by the deadline.

99.    On October 18, 2018, Chloe received an email from Davis asking how she was doing. This was Chloe's last contact with Brown's Title IX Office.

100.    Chloe's 17-month ordeal from the time of her sexual assault to Brown's retaliation finding against her and her experience with Brown's Title IX Office, had significant deleterious effects on her mental health and her ability to participate in educational programs and academic activities at Brown.

101.    As a direct and proximate result of Brown's misconduct, Chloe was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and she continued to suffer from generalized anxiety and major depressive disorder and has shown physical manifestations of those disorders, for which she sought therapy. Specifically, Chloe became hyper-anxious any time she was on campus. She suffered from panic attacks and chronic fatigue, which caused her to miss several classes and work shifts and to disengage from social activities. She received two incompletes in classes and was also unable to study abroad.

### COUNT I
**Violation of Title IX**
**Retaliation by Withholding Protection Otherwise Conferred by Title IX**
**20 U.S.C. §§ 1681, *et seq*.**
**(Plaintiff Chloe v. Brown)**

102.    Chloe hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

103.    Chloe alleges violations of Title IX against Brown due to retaliation. Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

104.    Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

105.    Chloe engaged in protected activity by reporting incidents of sex/gender-based discrimination perpetrated on her by a Brown student to Brown staff.  Chloe's actions were protected by the anti-retaliation provision of Title IX.

106.    Brown engaged in materially adverse actions against Chloe where it failed to report Chloe's disclosures of sexual misconduct, where Brown's Title IX Office failed to initiate appropriate interim measures to ensure Chloe's safety and ongoing equal access to educational opportunities and benefits, where Brown disregarded the finding of responsibly against Chloe's assaulter and appointed him the mid-year graduation speaker, and where Brown's Title IX Office failed to implement appropriate sanctions and responsive measures to remedy the sexually hostile environment and prevent its recurrence.

107.    There was a causal connection between Chloe's decisions to exercise her rights under Title IX by reporting sex/gender-based discrimination and Brown's decision to engage in adverse actions against her.

108.    As a direct and proximate result of Brown's Title IX retaliation, Chloe has sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits, loss of income and other economic damages, for which she is entitled to just compensation.

## COUNT II
### Intentional Infliction of Emotional Distress

109.    Chloe hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

110.    Chloe alleges intentional infliction of emotional distress by Brown in its response to her report of sexual misconduct to Brown.

111.    By dismissing Chloe's allegations of sexual misconduct, failing to properly investigate such claims and protect her from her assailant, justifying the behavior of her assailant, failing to properly discipline her assailant, and improperly disciplining and retaliating against Chloe, Brown engaged in extreme and outrageous conduct and specifically intended for its conduct to cause Chloe to suffer emotional distress so severe that it would silence Chloe from making any additional complaints or disclosures.

112.    As a direct and proximate result of Brown's misconduct, Chloe was diagnosed with PTSD and continued to suffer from generalized anxiety and major depressive disorder, for which she has shown physical manifestations and sought therapy.

113.    As a direct and proximate result of Brown's misconduct, Chloe received two incompletes in classes in which she was enrolled at Brown and was also unable to participate in Brown's study abroad program, which also caused her to suffer from severe emotional distress.

114.    As a direct and proximate result of Brown's extreme and outrageous conduct, Chloe suffered severe emotional distress, including, but not limited to, panic attacks, chronic fatigue, headaches, nausea, dizziness, shortness of breath, racing heart rate, depression, anxiety, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter.  Brown is aware of such emotional distress suffered by Chloe.

## **PRAYER FOR RELIEF**

For all the foregoing reasons, Chloe prays for judgment against Brown as follows:

A.    An award of damages, including compensatory damages and common law punitive damages;

B.    An award of litigation costs and expenses, including reasonable attorneys' fees and costs;

C.     For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law; and

D.     All such additional and further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Chloe hereby demands a trial by jury in this action of all issues so triable.

Dated: March 1, 2023

Respectfully submitted,

**HERMAN LAW GROUP**
Louise A. Herman, Esq. (Bar No.: 6430)
1445 Wampanoag Trail, Suite 104
East Providence, RI 02915
Tel: 401-277-4110
lherman@lhermanlaw.com

**SALTZ MONGELUZZI AND BENDESKY**
Elizabeth A. Bailey (*Pro Hac Vice Forthcoming*)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: 215-575-3859
ebailey@smbb.com

**GRANT & EISENHOFER P.A.**
Karin Fisch (*Pro Hac Vice Forthcoming*)
Irene Lax (*Pro Hac Vice Forthcoming*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8512
kfisch@gelaw.com

**GRANT & EISENHOFER P.A.**
Cynthia B. Morgan (*Pro Hac Vice Forthcoming*)
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
cmorgan@gelaw.com

*ATTORNEYS FOR PLAINTIFF*